1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBERT G. DREHER,
Acting Assistant Attorney General
SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Assistant Section Chief
COBY HOWELL, Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0339 (tel)
(202) 305-0275 (fax)

*Additional counsel listed in signature block*

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEVADA

| | |
|---|---|
| AMERICAN WILD HORSE PRESERVATION CAMPAIGN, et al.<br><br>Plaintiffs,<br><br>v.<br><br>TOM VILSACK, et al.,<br><br>Federal Defendants. | CASE NO. 3:13-cv-00441-MMD-VPC<br><br>**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER** |

## I.   INTRODUCTION

The Plaintiffs, American Wild Horse Preservation Campaign, *et al*., seek a temporary restraining order to "stop the sale of wild horses at a private auction . . . ." Pls.' Mem. at 1. The Forest Service did not authorize the removal of any wild horses from public lands, nor has it allowed the sale of wild horses. As explained in the attached declarations, all of the horses at issue in this case were gathered from tribal lands and have been carefully examined by state and

tribal brand inspectors, Bureau of Land Management ("BLM") and U.S. Forest Service ("USFS") wild horse specialists, and equine veterinarians.  All of the trained professionals agree that these gathered horses are domestic and are owned by the Tribe.  They are not wild horses within the meaning of the Wild Free-Roaming Horses and Burros Act ("Wild Horses Act"), 16 U.S.C. § 1331 *et seq*.  As such, the Court should deny Plaintiffs' motion for temporary restraining order.

## I.   BACKGROUND

### A.   Statutory and Regulatory Background

Under the Wild Horses Act, the Secretary of the Interior has jurisdiction over all the wild horses located on public lands administered by the Bureau of Land Management.  16 U.S.C. § 1332(e).  As co-administrator of the Act, the Secretary of Agriculture has jurisdiction over all wild horses and burros located on public lands administered by the Forest Service.  *Id.*

The statute defines "wild free-roaming horses and burros" as "all unbranded and unclaimed horses and burros on public lands of the United States." 16 U.S.C. § 1332(b). However, this provision contains no standard as to how to determine whether any given horse falls under that definition. See S. Rep. No. 92-242, *3, reprinted in 1971 U.S.C.C.A.N. 2,149, 2,151 (1971) ("A basic difficulty in determining the intended scope of the legislation is the definition of what constitutes a wild free-roaming horse or burro.").

Courts have recognized the Congressional intent in protecting herds is limited to where they were found at the time of the Act. *See Fallini v. Hodel*, 725 F. Supp. 1113, 1114 (D. Nev. 1989), *aff'd* 963 F.2d 275 (9th Cir. 1992) ("In 1971, Congress passed the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340, to protect wild horses and burros on public lands where they were historically found.") (emphasis added); *see also United States v.*

DEFS.' OPPOSITION TO PL.'S MOT.                     2       CASE NO. 3: 13-cv-441-MMD-VPC

*Christiansen*, 504 F. Supp. 364, 367 (D. Nev. 1980) (a domestic animal escaping from its corral onto public lands does not become a "wild free-roaming animal" within the meaning of the Act). The BLM's regulations interpreting the Act indicate that the horses protected by the Act are the descendants of those horses that were wild and free-roaming at the time the Act was passed in 1971.  43 C.F.R. § 4700.0-5(d). The USFS regulations implementing the Act reflect the same interpretation that the Act's protections are limited to horses or herds on public lands in 1971. *See, e.g.,* 36 C.F.R. § 222.20(13)(b) (definition of wild horses "does not include any horse or burro introduced onto the National Forest System on or after December 15, 1971, by accident, negligence, or willful disregard of private ownership.").

## B.  Factual Background

The border of the Fort McDermitt Paiute and Shoshone Reservation lies along the Nevada/Oregon border, roughly 23 miles west of the Owyhee Complex of HMAs.  Plaintiffs' motion concerns a gather conducted by the Fort McDermitt Tribal Council ("Tribe") allegedly pursuant to an agreement entered into by the USFS.  *See* Pls.' Ex. 4 ("Agreement").

As explained in the Declaration of Tom Frolli ("Frolli Decl."), since 2009, the Humboldt-Toiyabe National Forest has been working with the Tribe to address unauthorized grazing by horses owned by Tribal members on National Forest System ("NFS") lands adjacent to the reservation.  Unauthorized horses have been causing damage to NFS land by trampling and over grazing, reducing the forage available for wildlife and permitted livestock.  *Id.* ¶ 3-19.

The Forest Service and the Tribe entered into a Participating Agreement to cooperate in the gather and removal of unauthorized domestic horses.  Under the Participating Agreement, the Forest Service would hire a contractor to work in conjunction with Tribal members to gather unauthorized domestic horses and deliver them to a staging area located on the rodeo grounds on

the reservation.  After inspection by the Nevada State brand inspectors was complete captured

horses were to be delivered by truck to an auction yard at Fallon, Nevada, where they were to be

sold at auction.  The gather was scheduled to begin on August 9, 2013.  *Id.*

On August 8, 2013, the Forest Service received a letter from several environmental and

horse protection advocates, expressing concern about the potential for impacts of the gather on

wild horses.  While discussions with these groups were pursued, the Forest Service contract was

placed in suspension.  When agreement could not be reached with the advocacy groups to

proceed with the gather, the contract was suspended and there was no funding of any gathering

activities by the Forest Service.  *Id.*

Following the Forest Service's decision to suspend operations under the contract, the

Tribe and its agents conducted a gather of privately-owned, domestic horses located on and

adjacent to tribal lands between August 11-13, 2013.  Frolli Decl. ¶ 3-15.  The horses gathered

by the Tribe were inspected by the Tribal Brand Inspector, the Nevada State Brand Inspector,

and BLM Wild and Free Horses Specialist.  *Id.* ¶ 15.  The Tribe then endeavored to sell these

privately-owned, domestic horses at auction.  Plaintiffs filed a motion for a temporary restraining

order, arguing that some of the horses gathered by the Tribe were wild horses subject to the

protections of the Wild and Free-Roaming Horses and Burros Act. ECF 7. This Court granted

Plaintiffs' motion pending a hearing that is to take place on August 21, 2013, at 1:30 p.m. in

Reno Courtroom #5. ECF 20.

Plaintiffs make a number of inaccurate factual assertions throughout their memorandum.

Although Federal Defendants address the Plaintiffs' legal arguments with respect to the

Agreement, as a factual matter the gather at issue in this motion was done solely by the Tribe.

As explained in the Declaration of Tom Frolli, the Forest Service's participation was limited to

providing funds for temporary holding pens to ensure compliance with the Court's order and to ensure that no wild horses were sold.  Frolli Decl. ¶¶ 15-18. This declaration provides a cogent summary of the relevant facts of this case.

## II.  STANDARD OF REVIEW

When considering whether to grant an application for a temporary restraining order, the Court must examine four factors: (1) whether Plaintiff is likely to succeed on the merits; (2) whether Plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) whether the balance of equities tips in Plaintiff's favor; and (4) whether the public interest would be served by issuance of the temporary restraining order.  *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008) (addressing the factors in granting preliminary injunctions).  In this circuit, the standard for granting a preliminary injunction and the standard for granting a temporary restraining order are the same.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that preliminary injunction and temporary restraining order standards are "substantially identical."); *see also Winch v. Lifepoint RC. Inc.*, No. 3:10-CV-00061-LRH-RAM, 2010 WL 428918, at *1 (D. Nev. Feb. 1, 2010) ("The same legal standard applies to temporary restraining orders and preliminary injunctions sought pursuant to Federal Rule of Civil Procedure 65") (citation omitted).  In light of the Supreme Court's decision in Winter, courts must consider all four factors governing preliminary relief, *see Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1019 (9th Cir. 2009) (finding that the district court erred in granting a preliminary injunction because it failed to assess the non-merits factors – irreparable harm, balancing of equities, and the public interest – under the *Winter* standard), and may not issue an injunction based on the mere possibility that there will be irreparable injury, *see*

*Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (holding that plaintiff must show that irreparable injury is likely).

### III. ARGUMENT

#### A. **Plaintiffs are Not Likely to Succeed on the Merits, Nor Have They Raised Serious Questions.**

Plaintiffs have filed a complaint seeking to challenge a Federal action undertaken by the Forest Service -- its decision to enter into an Agreement with the Fort Tribe to gather unauthorized livestock from the reservation and National Forest System land. As Plaintiffs are aware, the Forest Service withdrew from that participating agreement, when it suspended the contract for the horse gather, and withdrew its funding. Moreover, the relief sought by Plaintiffs has nothing to do with the Federal action challenged by their lawsuit. It seeks to enjoin the sale of horses gathered entirely by the Tribe, on reservation land. The Forest Service did not authorize, fund, or participate in this horse gather, and does not have custody or control over the horses that were gathered. The remedy sought by Plaintiffs is wholly unrelated to the alleged Federal action challenged by their lawsuit. This alone is fatal to their motion.

With respect to their request for emergency injunctive relief, Plaintiffs miss the critical inquiry in this case and simply assume that any "unbranded" horses are wild horses. Pls.' Mem. at 11. This greatly oversimplifies the procedures employed by the Tribe. During the gather, qualified state and tribal brand inspectors examined each of the horses to make a determination as to ownership. *See* Declaration of Chris Miller ("Miller Decl.") ¶ 9. Many of the horses possess brands that provide a clear indication of ownership, but some do not. In those cases where there is no brand, the inspectors try to determine ownership by other methods like parentage, identifying marks (whether the horse had been shod or has bridle marks), behavior

towards humans, or any other indicators of ownership.  Miller Decl. ¶¶ 7-8 (explaining criteria).  For example, as the Plaintiffs already recognized in this case, newly born foals do not have brands, but are recognized as belonging to the owner of a mare that does possess a brand because foals stay with their mothers.  ECF 21, Emergency Joint Motion for Clarification.   It is both factually and legally incorrect to assume that all "unbranded" horses are *per se* wild horses.

The Wild Horses Act defines "wild free-roaming horses" as "all unbranded *and unclaimed* horses . . . on public lands of the United States."  16 U.S.C. § 1332(b) (emphasis added).  The regulations provide further criteria.  36 C.F.R. § 222.20 (b)(13).  The Act and regulations thus allow for the possibility of unbranded, yet domestic horses that are claimed by a private party.  A brand is certainly helpful, but under the Act it is not dispositive.

The Tribe relied on professional brand inspectors and wild horse specialists to make the determination of whether a horse is domestic or wild within the meaning of the Act and regulations.  Declaration of Arlo Crutcher  ("Crutcher Decl.") ¶ 11.  This determination is important because if a horse is wild, ownership is retained by the United States.  Thus, these professionals make a critical distinction between domestic horses and wild horses.

While Plaintiffs acknowledge the existence of unbranded, domestic horses, they do not allow for the possibility that brand inspectors would determine an unbranded horse is wild, in which case ownership would lie with the United States.  Instead they urge an oversimplified, binary test to be dispositive – whether a horse possesses a brand – but that construct reads an entire term out of the statute and does not acknowledge the reality of what is happening on the ground – namely, some horses without brands may be domestic or wild.  This is the critical inquiry Plaintiffs miss and they base their arguments on a false premise.  The most pressing and

immediate issue in this case is not whether a horse has a brand; it is whether relying on trained, professional, and unbiased brand inspectors and specialists is reasonable.

### 1. No Wild Horses Were Gathered.

As an initial matter, the USFS did not authorize the gather and in fact issued a stop work order. Crutcher Decl. ¶ 5-6. The Tribe conducted its own gather on its own tribal lands. *Id. ¶¶* 6-8. At one point the gather briefly scattered horses onto BLM lands, but the horses were pushed back onto tribal lands. *Id.* At no time did the gather take place on USFS lands, and this gather took place approximately 25-30 miles from any wild horse management unit. *Id.* ¶ 7. Based on the location of the gather, it was unlikely any wild horses were present in the area at that time. Frolli Decl. ¶ 14.

To ensure that no wild horses were sold, the tribe utilized trained, unbiased professionals to make the brand inspections and identify any wild horses. There were three inspectors that conducted evaluations of the horses -the BLM Wild Horse and Burro Coordinator, Shaney Rockefeller, Nevada State Brand Inspector, and the Tribal Brand Inspector. *Id.* ¶ 15. This was reviewed by equine veterinarians the following day. Frolli Decl. ¶¶ 16-17. Mr. Miller from the State of Nevada explains that each horse was examined to determine if it was domestic or wild using a variety of criteria. Miller Decl. ¶ 7 ("The criteria for our inspection included evaluations of each horse against the following criteria: signs of domestication (including branding, castration, shoeing, bridle path marking on heads, manes for signs of grooming), demeanor (including trained behavior and fear of humans), phenotypic evaluation (whither conditions, condition of hooves, weight, height, breeding, ect.), against legacy monitoring evaluations or wild horses and domestic horses."). Based on this review, there was consensus among all of these professionals that no wild horses had been gathered. Miller Decl. ¶ 9; Crutcher Decl. ¶ 11;

Frolli Decl. ¶ 17.  In addition, if a horse had been determined to be wild, the Forest Service would retain jurisdiction over that horse and it would have been returned to public land.  *Id.* ¶ 15.

### 2. The Agreement Does Not Authorize the Removal of Wild Horses From Public Lands.

Plaintiffs contend that there are "no measures" in the Agreement to protect wild horses. Pls.' Mem. at 13.  Even if the Agreement was at issue in this motion, Plaintiffs' assertions are inaccurate.

First, Plaintiffs compound their mistakes by assuming that the Agreement authorizes the removal of wild horses.  The language of the Agreement dispels this erroneous presumption:

> The Fort McDermitt Tribal Council and the [USFS] have been working for a number of years to reduce *unauthorized horses belonging to tribal members* on the Santa Rosa Ranger District and surrounding lands in order to better manage range forage condition and reduce nuisances and hazards to residences on tribal lands. . . This document describes the responsibility of each party to facilitate the gathering and selling of unauthorized horses *for the owners of those horses*.

Agreement p.1 (emphasis added).  Plainly, the purpose of the Agreement is to remove stray Tribe-owned horses, not wild horses from public lands.  Indeed, despite Plaintiffs extensive involvement this case and others, they have presented *no evidence* that a wild horse has in fact been gathered by the Tribe.  To their credit, Plaintiffs merely contend that it is *possible* wild horses have been gathered.  Fite Declaration ¶ 11 ("I believe it is entirely possible that some of the horses rounded up [by] tribal members on Forest Service lands are federally protected wild horses that have strayed from the Little Owyhee HMA on BLM lands."), *but see* Frolli Decl. ¶ 6 (no known wild horse populations on these National Forest lands).  There is a vast legal difference between an agreement that contemplates the removal of domestic horses and a

document that specifically authorizes the removal of wild horses from public lands. That is why

Plaintiffs' reliance on the Wild Horses Act is inapposite.

The Agreement is authorized under Wyden Amendment, not the Wild Horses Act.

Nothing in the Wyden Amendment precludes the USFS from entering into an Agreement that

facilitates the removal of unauthorized tribal horses on public or private lands. In fact, it

provides broad discretion to the USFS:

> appropriations for the Forest Service may be used by the Secretary of Agriculture
> for the purpose of entering into cooperative agreements with willing Federal,
> tribal, State and local governments, private and nonprofit entities and landowners
> for the protection, restoration and enhancement of fish and wildlife habitat, and
> other resources on public or private land, the reduction of risk from natural
> disaster where public safety is threatened, or a combination thereof or both that
> benefit these resources within the watershed.

P.L. 105-277, 112 Stat. 2681, Div. A, § 101(e), Title III, § 323(a) (Oct. 21, 1998). Plaintiffs

have failed to explain how the Agreement violates the Wyden Amendment or is inconsistent in

any manner.

Second, just because the Plaintiffs allege that this Agreement may have a possible effect

on wild horses (which as a factual matter is not true), it does not mean that the USFS' actions are

arbitrary and capricious. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir.

2010) (explaining the high threshold for arbitrary and capricious). The Agreement does not rely

solely on the geographical and temporal limitations. *See* Frolli Decl. ¶ 14 (explaining his review

documenting how no known wild horses were in this area). For example, under the terms of the

Agreement, the Tribe has agreed that: "Individual horses will not be transported off tribal lands

until a title certificate has been issued by the State Brand Inspector." Pls.' Ex. 4, Agreement ¶

III, H. Similarly, the Tribe is obligated to: "Facilitate a Nevada/Oregon State brand inspection so

horses can legally be transported off the reservation and legally sold." *Id.* ¶ III, J; *see also id.,* ¶ III, M (requiring a tribal brand inspector). The Forest Service also reserved the right to "retain control of identified non-tribal horses for owner redemption or Forest Service disposition in accordance with Nevada statute NRS 565.125(1)." *Id.* ¶ IV, G.[1] The parties also agreed to abide by the terms of an operating plan, which provides: "All horses will be inspected by NDOA [Nevada Department of Agriculture], Agricultural Enforcement Brand Inspectors for brands and marks." *Id.*, Ex. B at 1.[2]

In light of the geographical limitations and subsequent measures to ensure that no wild horses are mistakenly gathered, there can be no question that the USFS' actions are reasonable and comply with the APA. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

Plaintiffs also make the alternative argument that the USFS has failed to "protect" or "maintain vigilance for the welfare" wild horses by entering into the Agreement. Pls.' Mem. at 8, 14. This amorphous "failure to protect" or "failure to maintain vigilance" claim is not justiciable.

Where a statute like the Wild Horses Act does not provide for a private right of action, the APA provides for judicial review. 5 U.S.C. § 704. Section 706(1) of the APA empowers a

---

[1] Under NRS 565.125(1), there is a specific exemption for wild horses: "2. The provisions of this section do not apply to: (c) A wild horse or burro, as defined in 16 U.S.C. § 1332 . . . ."

[2] Plaintiffs reference to the provision of the operating plan that allows the Tribe to take possession of "unbranded/unknown ownership/ [and] unclaimed horses" misconstrues that provision. That provision refers to unclaimed domestic horses, not wild horses where ownership resides with the United States. Pls.' Mem. at 13.

district court to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).  Such a claim is commonly referred to as a "failure to act" claim.  In *Norton v. S. Utah Wilderness Alliance ("SUWA"),* 542 U.S. 55 (2004), a unanimous Supreme Court recognized that "[f]ailures to act are sometimes remediable under the APA, but not always."  *Id.* at 61.  After reviewing the limits on APA review of agency inaction, the Court held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take "a discrete agency action that it is required to take."  *Id.* at 64.  The limitation to discrete agency action precludes jurisdiction to review broad programmatic attacks or general allegations that an agency is "failing" to manage resources according to a statutory objective.  *Id.* at 65-67.

Although Plaintiffs cast this as a mandatory duty under the Wild Horses Act, the language "protect" and "maintain vigilance" provides broad discretion that is not enforceable under the APA.  In *SUWA* the Supreme Court discussed the parameters of these types of claims and expressly warned Federal courts not to become embroiled in the day-to-day task of directing agencies how to exercise their discretion:

> The principal purpose of the APA limitations we have discussed-and of the traditional limitations upon mandamus from which they were derived-is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.  If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved-which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*SUWA*, 542 U.S. at 66-67.  Unless the statutory language commands the agency to issue a rule, license, order, or "equivalent thereof" and leaves no room for agency discretion, the Supreme

Court has directed district courts to stay their hand.  *Id.* at 61-62.  Indeed, the Supreme Court

even references the Wild Horses Act in its analysis:

> To take just a few examples from federal resources management, a plaintiff might allege that the Secretary had failed to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance," or to "manage the [New Orleans Jazz National] [H]istorical [P]ark in such a manner as will preserve and perpetuate knowledge and understanding of the history of jazz," or to "manage the [Steens Mountain] Cooperative Management and Protection Area for the benefit of present and future generations." 16 U.S.C. §§ 1333(a), 410bbb-2(a)(1), 460nnn-12(b).

*Id.* at 67.  Ultimately, the Supreme Court held: "when an agency is compelled by law to act

within a certain time period, but the manner of its action is left to the agency's discretion, a court

can compel the agency to act, but has no power to specify what the action must be."  *Id.* at 65.

Here, Plaintiffs cannot maintain a failure to protect or maintain vigilance claim because such

duties are left to the agency's discretion.

    In sum, whether Plaintiffs' argument is construed as a challenge to the USFS' authority

under the Wyden Amendment, or a failure to act claim under the Wild Horses Act,  Plaintiffs

have no chance of success, nor have they raised serious questions as to the merits.

## B.  Plaintiffs Have Not Demonstrated Irreparable Harm.

    To meet the irreparable injury requirement, a plaintiff must do more than simply allege

imminent harm; it must demonstrate it.  *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d

668, 674 (9th Cir. 1988).  This requires a plaintiff to demonstrate by specific facts that there is a

credible threat of immediate and irreparable harm. Fed. R. Civ. P. 65(b)(1)(A).  Mere

"[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a

preliminary injunction."  *Caribbean Marine*, 844 F.2d at 674-75.

Plaintiffs' allegations of irreparable harm are limited to the "possibility" of wild horses being sold. Pls.' Mem. at 15. As discussed above, no wild horses were gathered by Tribal members, and this has now been confirmed by qualified brand inspectors and veterinarians. Frolli Decl. ¶ 17. Because Plaintiffs' allegations of irreparable harm are limited to the possible sale of wild horses and this did not occur, they have decidedly failed to carry their burden.

### 1. If the Court is Inclined to Grant Temporary Injunctive Relief a Bond is Warranted.

If the Court concludes that Plaintiffs are entitled to emergency injunctive relief in the form of a preliminary injunction or temporary restraining order, the Court should require Plaintiffs to post a fully compensatory security bond in accordance with Federal Rule of Civil Procedure 65(c). This Rule provides, in relevant part:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained . . . .

Fed. R. Civ. P. 65(c). On its face, Rule 65(c) admits no exceptions; in other words, the bond is a condition of the injunction. Courts have affirmed the ongoing validity of the bond requirement. *See, e.g., Novus Franchising, Inc. v. Oksendahl*, Nos. 07-1964, 07-1965, 2007 WL 2084143, at *6 (D. Minn. July 17, 2007) ("[Rule] 65(c) does not allow the parties to waive the bond-posting requirement"); *Midwest Gov't Sec., Inc. v. Brittenum & Assocs., Inc*., No. 85c4373, 1985 WL 1268, at *1 (N.D. Ill. May 3, 1985).

There is no "public interest exception" to Rule 65(c); non-profit and environmental plaintiffs are not exempt from the bond requirement. *See, e.g., Habitat Educ. Ctr. v. U.S. Forest Serv*., 607 F.3d 453, 457 (7th Cir. 2010) (rejecting plaintiffs' argument that non-profit entities should be exempt from the requirements of Rule 65(c) as "fl[ying] in the face of Rule 65(c)").

*See also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *Utahns for Better Transp. v. U.S. Dep't of Transp.,* Nos. 01-4216, 01-4220, 2001 WL 1739458 at *5 (10th Cir. Nov. 16, 2001).  Absent extraordinary circumstances, a court errs in failing to grant a request for a bond. *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.,* 627 F.2d 44, 54 (7th Cir. 1980).

      Here, a bond is required and appropriate.  As noted above, following the Court's issuance of the injunction on August 16, 2013, the Forest Service enlisted the services of a contractor to construct temporary holding pens on Fallon property to house the Tribe's unsold horses.  Frolli Decl. ¶ 18.  These steps were taken to ensure compliance with the Court's temporary restraining order. *Id.*  If an interim injunction were to issue, the cost of holding these horses in temporary pens is approximately $10,000 per day. *Id.*, Ex. N.  In light of the fact that there are no wild horses involved in this gather, it would be appropriate to have the Plaintiffs post a bond if the Court is inclined to grant continuing temporary injunctive relief while the Court reviews the merits of this case.  Moreover, the Plaintiffs provided no evidence that they are unable to post a bond to cover the costs while the merits of this case are decided.  To the extent the Court is inclined to grant temporary injunctive relief, a reasonable and fully compensatory bond would be appropriate in these circumstances.

**IV. CONCLUSION**

      For the reasons set forth above, the Court should deny Plaintiffs' motion for temporary restraining order.

1  Dated: August 20, 2013

2

3                                       Respectfully Submitted,

4                                       DANIEL G. BOGDEN
                                        United States Attorney
5                                       GREG ADDINGTON
                                        Nevada Bar #6875
6                                       Assistant United States Attorney
                                        100 West Liberty Street, Suite 600
7                                       Reno, Nevada 89501
                                        Ph: (775) 784-5438
8                                       Fax: (775) 784-5181

9
                                        ROBERT G. DREHER,
10                                      Acting Assistant Attorney General
                                        SETH M. BARSKY, Section Chief
11                                      S. JAY GOVINDAN,
                                        Assistant Section Chief
12

13                                      /s/ Coby Howell
                                        COBY HOWELL, Senior Trial Attorney
14                                      ERIK PETERSON, Trial Attorney
                                        TRAVIS J. ANNATOYN, Trial Attorney
15                                      U.S. Department of Justice
                                        Environment & Natural Resources Division
16                                      Wildlife & Marine Resources Section
                                        Ben Franklin Station
17                                      P.O. Box 7611
                                        Washington, DC 20044-7611
18                                      Phone: (202) 305-0237
                                        Fax: (202) 305-0275
19

20                                      Attorneys for Federal Defendants

21

22

23

24

25

26

27
   DEFS.' OPPOSITION TO PL.'S MOT.         16      CASE NO. 3: 13-cv-441-MMD-VPC
28

**UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF NEVADA**

LAURA LEIGH,

       Plaintiffs,

              v.

S.M.R. JEWELL, et al.,

       Defendants.

CASE NO. 3:13-cv-00441-MMD-VPC

**CERTIFICATE OF SERVICE**

    I hereby certify that on August 20, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

                              */s/ Coby Howell*
                              COBY HOWELL